IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 01-31223
_____

DONALD RAY ROBERTSON,

Petitioner - Appellant,

versus

BURL CAIN, Warden, Louisiana State Penitentiary,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

March 5, 2003

Before KING, Chief Judge, and JOLLY and HIGGINBOTHAM, Circuit
Judges.

E. GRADY JOLLY, Circuit Judge:

In this appeal, Petitioner Donald Ray Robertson, a prisoner of
the State of Louisiana, seeks review of a district court order
denying his petition for federal habeas relief.  Specifically,
Robertson contends that an erroneous jury instruction deprived him
of his Fourteenth Amendment due process rights.  The State of
Louisiana admits that the jury instruction was contrary to clearly
established federal law, but it argues that Robertson is not
entitled to federal habeas relief because the error was harmless.

In order to resolve this appeal, we must decide whether the
standard for harmless error analysis articulated in <u>Brecht v.</u>

Abrahamson, 507 U.S. 619 (1993), remains viable precedent after the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. We hold that AEDPA's restrictions on federal review of state habeas decisions do not alter Brecht's mandate for harmless error analysis by federal courts when state courts have failed to address the question of harmless error. We further hold that the specific jury instruction on the law of principals given in this case violated clearly established federal law by improperly relieving the prosecution of the burden of proving an essential element of the crime (namely, the defendant's specific intent to kill). See Sandstrom v. Montana, 442 U.S. 510 (1979); Flowers v. Blackburn, 779 F.2d 1115 (5th Cir. 1986); State v. West, 568 So. 2d 1019 (La. 1990). Finally, applying the Brecht standard to the record in this case, we conclude that the state trial court's erroneous jury instruction did have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. at 637. Accordingly, we reverse the district court's judgment denying federal habeas relief and remand.

I

Petitioner Donald Ray Robertson is currently serving a life sentence in the Louisiana State Penitentiary. In January 1987, Robertson was convicted in state court on two counts of murder in the first degree for his role in the murders of Clayton Jones and

Curtis Hardy.[1]   On direct appeal, Robertson challenged his conviction on account of several evidentiary errors at trial and the insufficiency of the evidence against him, and Robertson's conviction was affirmed by the Louisiana Court of Appeal for the Fourth Circuit.  See State v. Robertson, 516 So. 2d 180 (La. App. 1987).

Robertson did not seek direct review of his conviction by the Louisiana Supreme Court, but he did file three applications for post-conviction relief in Louisiana state court.  Robertson filed his first application for post-conviction relief with the state trial court in August 1991.  In that first application, Robertson raised three claims, including ineffective assistance of counsel,

---

[1]   Robertson was indicted, along with his alleged co-perpetrators, Gerald Gerrell and David West, for the first degree murders of Jones and Hardy.  The three defendants were tried separately and each convicted as principals for the two counts of first degree murder.  The jury in each case received an identically worded instruction on the law of principals.  As discussed more fully, hereafter, that jury instruction relieved the prosecution of the burden of proving, beyond a reasonable doubt, each defendant's specific intent to kill Jones and Hardy and, therefore, violated the Fourteenth Amendment's due process guarantee.  West's conviction was subsequently vacated on direct appeal by the Louisiana Supreme Court on account of the constitutionally erroneous jury instruction on the law of principals given in his case.  See State v. West, 568 So. 2d 1019 (La. 1990).  The conviction of Gerrell, the apparent triggerman in the murders, was affirmed on appeal, and Gerrell's petition for federal habeas relief was denied because the constitutional error was believed to be harmless.  Gerrell v. Whitley, No. 92-4019(F)(6) (E.D. La. May 3, 1993) aff'd No. 93-3345 (5th Cir. Sept. 1, 1994) (per curiam).  As explained more fully, hereafter, there are significant differences between the evidence as it relates to Gerrell and to Robertson, respectively.  In the light of these differences, we are not inconsistent in granting relief to Robertson after denying relief to Gerrell.

3

erroneous introduction of hearsay evidence, and denial of constitutional due process based on an improper jury instruction on the law of principals. The trial court denied Robertson's application without written comment, and the Louisiana Court of Appeal for the Fourth Circuit affirmed this decision, finding each of Robertson's claims to be without merit. See State v. Robertson, No. 92-KW-0081, slip op. at 1-2 (La. App. Feb. 6, 1992). With respect to Robertson's due process claim, the Louisiana Fourth Circuit specifically held that "the jury instruction on the law of principals was sufficient for the jury to conclude that the relator had the requisite specific intent." Id., slip op. at 1. Robertson sought review of this decision in the Louisiana Supreme Court, but it declined Robertson's writ application. See State v. Robertson, 626 So. 2d 1184 (La. 1993).

In June 1994, Robertson filed a second application for post-conviction relief, arguing that his conviction was unconstitutional and that his sentence was, therefore, illegal. This second request was also denied by the state trial court, by the Louisiana Fourth Circuit Court of Appeal, and ultimately by the Louisiana Supreme Court. See State ex rel. Robertson v. Whitley, 683 So. 2d 243 (La. 1996).

In October 1996, in his third and final post-conviction application in state court, Robertson reiterated his due process objection to the jury instruction on the law of principals that was given in his murder trial. This time, the state trial court agreed

4

with Robertson's claim and granted Robertson a new trial based on Sandstrom v. Montana, 442 U.S. 510 (1979); Flowers v. Blackburn, 779 F.2d 1115 (5th Cir. 1986); and State v. West, 568 So. 2d 1019 (La. 1990). However, the Louisiana Fourth Circuit Court of Appeal granted the state's application for a supervisory writ and reversed the trial court's determination, holding Robertson's post-conviction application time-barred by Article 930.8 of the Louisiana Code of Criminal Procedure. See State v. Robertson, No. 97-K-11523, slip op. at 1-2 (La. App. Dec. 29, 1997). The Louisiana Supreme Court also denied Robertson's writ application, citing Article 930.8. See State ex rel. Robertson v. State, 719 So. 2d 1050 (La. 1998) (citing La. Code Crim. Proc. art. 930.8).

Robertson then filed his instant pro se petition for post-conviction relief under 28 U.S.C. § 2254 in the Eastern District of Louisiana. Once again, Robertson argued that the state trial court's jury instruction on the law of principals violated the due process holdings of Sandstrom v. Montana, Flowers v. Blackburn, and State v. West by relieving the prosecution of its burden of proving that Robertson had a specific intent to kill. The district court initially dismissed Robertson's petition with prejudice on the grounds that the petition was untimely under 28 U.S.C. § 2244(d)(1)(A), but a panel of this Court reversed that ruling and remanded Robertson's case with instructions to the district court to consider the merits of Robertson's § 2254 petition. See Robertson v. Cain, No. 00-30315 (5th Cir. Nov. 20, 2000)

5

(unpublished) (granting Robertson's request for a certificate of appealability and reversing the district court's dismissal with prejudice based on Smith v. Ward, 209 F.3d 383, 385 (5th Cir. 2000)).

On remand, a magistrate judge recommended that the district court grant habeas relief on account of the erroneous jury instruction. In response, the Respondent filed a formal objection to the magistrate's report and recommendation, arguing first that the jury instruction was not as prejudicial as the constitutionally defective instructions in Flowers and West and second that any error in the jury instruction was harmless. The district court sustained the Respondent's objections and denied Robertson's § 2254 petition. The district court recognized that the state court's jury instruction was contrary to clearly established federal law; nevertheless, the district court concluded that it should deny Robertson's petition for federal habeas relief because Robertson failed to show that the state court's constitutionally erroneous jury instruction was also an "unreasonable application of" clearly established federal law. In addition, the district court held that the erroneous jury instruction was "harmless beyond a reasonable doubt," applying the harmless error standard in Chapman v. California, 386 U.S. 18, 23 (1967).

We granted Robertson a certificate of appealability on March 15, 2002.

II

6

On appeal from the denial of a § 2254 petition, this court reviews a district court's findings of fact for clear error, and it reviews a district court's conclusions of law de novo, applying the same standard of review to the state court's decision as the district court. Donahue v. Cain, 231 F.3d 1000 (5th Cir. 2000). Mixed questions of law and fact, such as the district court's assessment of harmless error, are also reviewed de novo. Jones v. Cain, 227 F.3d 228, 230 (5th Cir. 2000).

Because Robertson filed his petition for federal habeas relief in April 1999, our review is under 28 U.S.C. § 2254, as amended by AEDPA. See Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless the adjudication of the petitioner's claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "A state court's decision will be contrary to clearly established federal law when it reaches a legal conclusion in direct opposition to a prior decision of the United States Supreme Court or when it reaches a different conclusion than the United States Supreme Court on a set of materially indistinguishable facts." Kutzner v. Johnson, 242 F.3d 605, 608

7

(5th Cir. 2001).  Moreover, a state court's decision will be an unreasonable application of clearly established federal law whenever the state court identifies the correct governing legal principle from the Supreme Court's decisions but applies that principle to the facts of the prisoner's case in an "objectively unreasonable" manner.  Id. (citing Williams v. Taylor, 529 U.S. 362, 409 (2000) (O'Connor, J., writing for the Court)).

The district court read § 2254(d)(1) to impose a two-fold requirement on Robertson to show that the state court adjudication of his jury instruction claim was both "contrary to" clearly established federal law and an "unreasonable application of" clearly established federal law.  It, therefore, held simultaneously that the state court decision was "contrary to" but not an "unreasonable application of" clearly established federal law.  The district court's reading of § 2254(d)(1) is wrong as a matter of law as decided by the United States Supreme Court.  The plain language of § 2254(d)(1) is unmistakably disjunctive, and the Supreme Court has held that independent meaning must be given to both the statute's "contrary to" clause and its "unreasonable application of" clause.  See Williams v. Taylor, 529 U.S. at 404-05, 412-13 (O'Connor, J., for the Court) (noting that the writ of habeas corpus may issue only if "one" of the two conditions in § 2254(d)(1) is satisfied) (emphasis added).  Thus, under § 2254(d)(1), Robertson should be entitled to federal habeas relief if he can show that the state court adjudication of his claim was

8

either "contrary to" clearly established federal law "or" an "unreasonable application" of clearly established federal law, as determined by the United States Supreme Court. See 28 U.S.C. § 2254(d)(1) (emphasis added).

Robertson argues that the Louisiana Fourth Circuit Court of Appeal's habeas decision upholding the state trial court's jury instruction on the law of principals was contrary to the Fourteenth Amendment due process guarantees clearly established in In re Winship, 397 U.S. 358 (1970), and Sandstrom v. Montana, 442 U.S. 510 (1979). In Winship and Sandstrom, the Supreme Court clearly declared unconstitutional any jury instruction that relieved the state of its Fourteenth Amendment burden of proving every element of a criminal offense beyond a reasonable doubt. See Sandstrom, 442 U.S. at 520-24 (citing Winship, 397 U.S. at 364). At the close of Robertson's trial for first degree murder, the state court gave the jury an instruction on the law of principals that falls short on one of the elements of first degree murder – namely, specific intent to kill:

> Next ladies and gentlemen of the jury, the court will charge you as to the law as it pertains to principles [sic]. Our law provides as follows: All persons concerned in the commission of a crime whether present or absent and whether they directly commit the act constituting the offense aid and abet in its commission or directly or indirectly counsel or procure another to commit the crime, are principles [sic].
>
> In other words to be concerned in the commission of a crime it must be shown that

9

the person or persons charged did something knowingly and intentionally in furtherance of a common design or to put it another way that they or he aided, abetted and assisted in the perpetuation of the offense. All persons knowing the unlawful intent of the person committing the crime who are present and consented thereto in aiding and abetting either by furnishing the weapons of the attack, encouraging by words or gestures, or endeavoring at the time of the commission of the offense to secure the safety or the concealment of the offender, are principals and are equal offenders and are subject to the same punishment.

To render one guilty as a principle [sic] he must have committed the offense himself or in some way participated in the commission of the crime, or he must have aided, assisted or abetted the actual perpetratro [sic] of the deed before it might be said that he was concerned in the commission of the crime.

State Record 2: 15-16. This jury instruction is virtually identical to the one that this court found to be unconstitutional in Flowers v. Blackburn, 779 F.2d at 1117 (decided nine days before Robertson's first degree murder convictions), and it violates Winship and Sandstrom for essentially the same reasons stated in Flowers. As this court explained in Flowers, under Louisiana state law, the prosecution must show that a defendant had "'the specific intent to kill'" in order to prove murder in the first degree. See Flowers, 779 F.2d at 1121 (quoting State v. Holmes, 388 So. 2d 722, 276 (La. 1980)). The jury instruction in Robertson's murder trial, like the jury instruction in Flowers, "'plainly relieve[d] the State of the burden of proof enunciated in Winship on the critical question of ... state of mind" by telling the jury that the jury

10

could convict "[a]ll persons knowing the unlawful intent of the person committing the crime who were present" as "equal offenders" "subject to the same punishment." See Flowers, 779 F.2d at 1111 (quoting Sandstrom, 442 U.S. at 521). In effect, the jury instruction relieved the state of the burden of proving Robertson's specific intent to kill. See id. Considering the charge as a whole, a reasonable juror could have concluded that the state needed to show only that one of the other persons implicated in the crime had the specific intent to kill in order to convict Robertson of first degree murder. See id. This result is contrary to the governing rule established in Winship and its progeny, including Sandstrom.

In its habeas decision upholding Robertson's erroneous jury instruction, the Louisiana Fourth Circuit Court of Appeal did not refer to the Supreme Court's decisions in Sandstrom or to this court's decision in Flowers v. Blackburn, but, because Robertson specifically relied on these decisions in his first petition for state habeas relief, we assume that the state court was aware of these decisions. See Catalan v. Cockrell, 315 F.3d 491, 493 & n.3 (5th Cir. 2002). However, even if we assume that the state court "identified" the correct constitutional principles governing this case, see Williams v. Taylor, 529 U.S. at 407, we must conclude that the Louisiana Fourth Circuit either disregarded those principles or applied those principles unreasonably to the jury

11

instruction at hand. The holding of the Louisiana Fourth Circuit – that "the jury instruction on the law of principals was sufficient for the jury to conclude that the relator had the requisite specific intent" – cannot be squared with the constitutional principles articulated in Winship or Sandstrom for the reasons articulated by this court in Flowers, 779 F.2d 1121-23, and by the Louisiana Supreme Court in State v. West, 568 So. 2d 1019, 1022-24 (La. 1990).[2] The Louisiana Fourth Circuit should have recognized that the jury instruction allowed the jury to convict Robertson of first degree murder based on much less than what was required by Louisiana law and, therefore, violated the Due Process Clause of the Fourteenth Amendment. The Fourth Circuit's failure to recognize this constitutional failing makes its decision contrary to Sandstrom. Robertson, therefore, has clearly satisfied the requirements of 28 U.S.C. § 2254(d)(1) in this case.

---

[2] The Louisiana Fourth Circuit's habeas decision is certainly unreasonable (in the general, if not the AEDPA-specific, sense of the word) in the light of the decision of the Louisiana Supreme Court in State v. West. As discussed above, in West, the Louisiana Supreme Court followed our decision in Flowers v. Blackburn and overturned the first degree murder convictions of Robertson's alleged co-perpetrator, David West, on direct appeal on account of a constitutionally erroneous jury instruction on the law of principals that was identical to the instruction given in Robertson's case. See State v. West, 568 So. 2d at 1022-24.

III

The Respondent does not dispute that Robertson's jury instruction violated the constitutional due process holdings of Winship and Sandstrom; nor does he seriously defend the Louisiana Court of Appeal's erroneous ruling upholding the constitutionality of that jury instruction. The Respondent argues only that federal habeas relief is unwarranted because the erroneous jury instruction was a harmless error.[3]

On direct appeal, when faced with a constitutional violation, a court must reverse the judgment of the court below unless the constitutional error is "harmless beyond a reasonable doubt." See Chapman v. California, 386 U.S. 18, 24 (1967). However, in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), the Supreme Court

---

[3] In Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991), the Supreme Court recognized two categories of constitutional violations, "trial error" and "structural defects." Trial error occurs "during the presentation of the case to the jury," and is amenable to harmless error analysis because it "may ... be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless...." Id. On the other hand, structural defects "'defy analysis by harmless error standards'" and require "automatic reversal of the conviction" because they affect "'the constitution of the trial mechanism" and, therefore,"the entire trial process." Brecht v. Abrahamson, 507 U.S. 619, 629 (1993) (quoting Fulminante, 499 U.S. at 308-10). A Sandstrom-type error has been held to be a "trial error" to which the harmless error rule applies. See Rose v. Clark, 478 U.S. 570 (1986) (holding harmless error analysis appropriate for jury instruction that erroneously charged jury on the element of malice); California v. Roy, 519 U.S. 2 (1996) (holding that a jury instruction that did not include a statement informing the jury that they must find intent should be reviewed for harmless error).

13

articulated a "less onerous" standard for assessing the impact of a state court's constitutional error on collateral review. Under Brecht, a federal court may grant habeas relief on account of constitutional error only if it determines that the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." See id. at 623 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Under this standard, however, the petitioner should prevail whenever the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error." O'Neal v. McAninch, 513 U.S. 432, 436 (1995). As this court has explained, "if our minds are 'in virtual equipoise as to the harmlessness' under the Brecht standard, of the error, then we must conclude that it was harmful." Woods v. Johnson, 75 F.3d 1017, 1026-27 (5th Cir. 1996) (quoting O'Neal, 513 U.S. at 435).

In this appeal, however, Robertson argues that, under AEDPA, the Brecht standard – that is, a separate standard for harmless error in federal habeas cases – is no longer applicable to constitutional errors arising in state habeas cases. Robertson argues that, under AEDPA's restrictive review of state court decisions, the federal habeas court is required to review only whether the state court's decision is "contrary to" or an "unreasonable application of" Chapman and grant relief accordingly. Robertson argues that where, as in this case, the state court has failed to apply Chapman at all, then the federal courts should do

14

what the state court was required to do, but failed to do, that is, apply Chapman to determine whether the constitutional error is harmless.

In past cases under AEDPA, this court has recognized that there has been some doubt among the federal circuit courts about whether the Brecht standard for harmless error remains applicable after AEDPA. See, e.g., Tucker v. Johnson, 242 F.3d 617, 629 n.16 (5th Cir. 2001) (citing cases); Hernandez v. Johnson, 248 F.3d 344, 379 (5th Cir. 2001) (Dennis, J., dissenting) (citing cases). In Whitmore v. Kemna, 213 F.3d 431 (8th Cir. 2000), the Eighth Circuit suggested that AEDPA might be interpreted to limit the scope of collateral federal review of harmless error and thereby abrogate the requirement that federal courts conduct an independent harmless error analysis under Brecht, at least in cases where the state court has already conducted a Chapman-type harmless error review of the alleged constitutional trial error. See Whitmore, 213 F.3d at 433 (suggesting in dicta that a state court assessment of harmless error is entitled to the same deference under 28 U.S.C. § 2254 as any other state court determination of fact or law). Similarly, in Noble v. Kelly, 246 F.3d 93, 101 n.5 (2d Cir. 2001) (per curiam), the Second Circuit noted an open question about whether federal courts should now apply a mixed AEDPA/Chapman standard and examine "whether the state court's decision was 'contrary to, or involved an unreasonable application of' Chapman." See Noble, 246 F.3d at 101 n.5. Since Kenma and Noble, however, the Supreme Court has

15

implicitly acknowledged the vitality of <u>Brecht</u>'s independent harmless error analysis in federal habeas cases brought under AEDPA. <u>See</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 795 (2001) (noting that even if the petitioner could satisfy the requirements of 28 U.S.C. § 2254(d)(1), the petitioner would still have to show that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict") (quoting <u>Brecht</u>, 507 U.S. at 637) (internal quotations and citations omitted). Moreover, all of the courts of appeals that have squarely decided the question have concluded that <u>Brecht</u>'s independent standard for harmless error continues to be appropriate in federal habeas cases, even after the enactment of AEDPA. <u>See</u> <u>Herrera v. Lemaster</u>, 301 F.3d 1192 (10th Cir. 2002) (<u>en banc</u>); <u>Sanna v. DiPaolo</u>, 265 F.3d 1, 14 (1st Cir. 2001); <u>Nevers v. Killinger</u>, 169 F.3d 352, 370 (6th Cir. 1999) <u>abrogated on other grounds by</u> <u>Harris v. Stovall</u>, 212 F.3d 940 (6th Cir. 2000). <u>See also</u> <u>Little v. Kern County Superior Court</u>, 294 F.3d 1075, 1083-84 (9th Cir. 2002) (applying <u>Brecht</u>, in addition to the requirements of AEDPA, without comment).

Our own consideration of <u>Brecht</u> and of AEDPA also persuades us that <u>Brecht</u> survives AEDPA's enactment. As other courts have recognized, <u>Brecht</u> sets forth a standard for harmless error analysis that was intended to apply to <u>all</u> federal habeas cases involving constitutional "trial" error. <u>See, e.g.</u>, <u>Herrera</u>, 301 F.3d at 1199 (citing <u>Brecht</u>, 507 U.S. at 623 (Rehnquist, J.,

16

writing for the court) and 643 (Stevens, J., concurring)).[4] We can assume that Congress was aware of Brecht when it enacted AEDPA, yet nothing in the text or the legislative history of AEDPA specifically or generally alludes to an alteration in the application of federal harmless error doctrine to a state court decision. In fact, the plain language of AEDPA says only that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim" is either "contrary to" or an "unreasonable application of" clearly established federal law, as defined by the Supreme Court, or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d)(1). The statutory language itself does not require federal habeas courts to grant relief reflexively. The words of the statute simply cannot be read to bar federal courts from further examination and review of state habeas claims based on additional standards established by Supreme Court precedent, especially when those standards are not inconsistent with the language and purpose of AEDPA. It is clear to us that the principles embodied in AEDPA are fully consistent with Brecht's standard for harmless error and with Brecht's observations concerning the limited role of the federal courts in habeas cases. In Brecht the Supreme Court adopted a more lenient

---

[4]     See also n.3, supra.

17

harmless error standard in federal review of habeas cases out of respect for the sovereign states' interests in the integrity of their own judicial processes and the finality of convictions that have survived direct review within the state court systems. See Brecht, 507 U.S. at 636 (noting that liberal allowance of the writ "degrades the prominence of the trial itself" and "encourages petitioners to relitigate their claims on collateral review") (citations and quotations omitted). In a similar vein, AEDPA was enacted, at least in part, to ensure comity, finality, and deference to state court habeas determinations by limiting the scope of collateral review and raising the standard for federal habeas relief, see 28 U.S.C. § 2254(d)(1)-(2); Calderon v. Thompson, 523 U.S. 538, 554-55 (1998) (noting that judicial limits on habeas relief generally comport with the purpose of AEDPA); Williams v. Taylor, 529 U.S. 420, 436 (2000) (noting that Congress indubitably intended AEDPA to further the principles of comity, finality, and federalism), and application of the Brecht standard to state court decisions parallels this congressional intent.

Thus, we hold that, in cases governed by AEDPA, federal habeas courts should continue to analyze the harmlessness of all state court decisions involving a constitutional "trial" error according to the Brecht standard. We therefore proceed with a Brecht analysis of the harmlessness of the Sandstrom error in this case.[5]

---

[5] We hold today that the district court erred as a matter of law when it decided to assess the harmlessness of the Sandstrom

18

IV

In this case, a jury found Robertson guilty of the first degree murder of Curtis Hardy and Clayton Jones. The question before us is whether the state trial court's erroneous jury instruction had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. at 637.

The state established that Hardy and Jones were each shot in the head at close range and killed sometime late at night on May 9 or early in the morning on May 10, 1985. The victims' bodies were discovered by officers of the New Orleans Police Department in an abandoned brown Chevy Malibu on the morning of May 10.[6] The

---

error in this case under the Chapman "harmless beyond a reasonable doubt" standard. However, it is worth noting that the erroneously applied Chapman standard is supposed to be more rigorous and less deferential to the state court than the Brecht standard that we re-affirm today. Because the district court ultimately concluded that the Sandstrom error was "harmless beyond a reasonable doubt" under Chapman, it may be surprising to some that we conclude that the error was not harmless under Brecht's less rigorous standard. However, after de novo consideration of the harmlessness of the Sandstrom error at trial, we are convinced that the district court further erred not only in identifying Chapman as the correct constitutional standard but also in applying the Chapman standard to this case. The district court apparently concluded that the Sandstrom trial error was "harmless beyond a reasonable doubt" because it believed that the record was sufficient to allow the jury to infer that Robertson had a specific intent to kill. For reasons explained more fully hereafter, given the lack of evidence supporting the conclusion that Robertson had a requisite specific intent to kill Hardy and Jones, we find the district court's harmless error conclusion to be erroneous under either Chapman or Brecht.

[6] State witness Lloyd Davis testified that he owned the Chevy Malibu in question and that he had loaned it to Curtis Hardy

19

victims were apparently last seen alive at Robertson's house between 10:30 and 11:00 p.m. on the night of May 9. Robertson's girlfriend, Consuela Marie Washington, testified that, on the evening in question, she arrived home to learn that Robertson was apparently meeting with Curtis Hardy in a back room of the house.[7] Washington testified that, about an hour later, she saw Hardy outside her house being led with his hands behind his back from her yard to a blue car by two men, whom she later identified as David West and Gerald Gerrell. Washington testified that, at the time she saw Hardy being taken away, she called Hardy's girlfriend, Lola King, and told King what she had seen.[8] About an hour later, around 11:30 p.m. or midnight, Robertson left the house, telling Washington that he was going to the liquor store.

A voluntary statement that Robertson made to police shortly after being charged with first degree murder provided the jury with further evidence about the night in question. In this statement

---

on the day of the murders. According to Davis, Robertson had never been inside the car.

[7] Robertson and Washington apparently lived together at the time. Washington testified that she did not actually see Hardy inside her house but that Robertson told her that Hardy had stopped by on his way to the house of his girlfriend, Lola King.

[8] Washington testified that Robertson and Hardy had some kind of argument before the night in question but that, on the night in question, everything between the two men was supposed to be all right. Washington's telephone call, however, alarmed Lola King. King testified at trial that, after Washington called, King called a friend and the police to report Hardy's possible kidnaping.

Robertson said that, on the night in question, he had received an electronic page from Hardy and that they agreed that Hardy would come to Robertson's house to buy drugs. While Robertson was waiting for Hardy, David West and Gerald Gerrell arrived. Although Robertson did not know Gerrell, Robertson agreed to give Gerrell drugs in exchange for a reel-to-reel tape player. Eventually, Hardy arrived with Curtis Jones. Hardy went inside the house to meet with Robertson, while Jones stayed outside with West and Gerrell. According to Robertson's statement, Robertson sold Hardy drugs and the two discussed possible future drug deals. Then, Hardy left the house. Robertson said that, a short while later, he opened his front door and was surprised to see West and Gerrell still standing on his front porch talking. Robertson said that he subsequently left the house around midnight to go to the liquor store to buy beer. On his way back from the liquor store, West and Gerrell pulled up alongside Robertson in a blue Plymouth Valiant, and the two men offered to give Robertson a ride home. Robertson said that when he got into the front passenger seat of the car, he felt that the seat was wet. Reaching behind him, in the seat, Robertson discovered a bloody towel and a bloody shirt and saw that he had blood on his own hands and clothes. Robertson said he asked what had happened, and Gerrell said that he and West had killed some people. Robertson said that, after hearing this, he threw the towel and the shirt out of the car. Robertson then looked down and saw a gun on the floor.

21

Shortly after these events described by Robertson, the three men were stopped by police who were investigating Hardy's possible kidnaping. Two separate searches of the blue Plymouth Valiant revealed a .357 magnum (the gun Robertson said he saw at his feet in the front seat), live and spent rounds of .357 ammunition, a pair of bloody jeans (later identified as West's), several bags of white powder, and personal items (including several rings, a watch, a beeper, and a driver's license) that belonged to either Hardy or Jones. After taking Robertson and the other defendants into custody further incriminating physical evidence was found. Police found blood on Robertson's shirt, right sock, and right slipper and confiscated from Robertson two rings that may have belonged to one of the victims.[9] Robertson's fingerprints were also subsequently found on the outside of the brown Chevy Malibu in which the bodies were discovered.[10]

---

[9] Police Officer Norman McCord testified at Robertson's criminal trial that Curtis Hardy's mother and brother identified the two rings confiscated from Robertson as jewelry that the victim always wore whenever he went out. However, Hardy's brother testified at trial that only one of the two rings was his brother's and that he had only seen that ring once before on the day of the murder. Hardy's brother said that he thought the other ring might belong to Clayton Jones. (Hardy's mother did not testify.) Furthermore, the victim's girlfriend, Lola Washington, examined both rings at the time Robertson was arrested, and did not recognize either one of them as belonging to the victim.

[10] Lloyd Davis, the owner of the car, testified that Robertson had never been in the car, but Robertson's alleged co-perpetrator, David West, testified that he saw Robertson standing next to the brown Chevy Malibu talking to Curtis Hardy, three days before the shooting.

There is no doubt that a properly instructed jury could have found beyond a reasonable doubt that Robertson was present at the murder of Hardy and Jones based on the physical evidence and on circumstances surrounding Robertson's arrest with West and Gerrell shortly after the time of the murders. However, much of Robertson's alibi statement to the police was corroborated at trial by the testimony of Consuela Washington and Robertson's alleged co-perpetrator, David West. According to West, Gerrell was responsible for kidnaping and killing Hardy and Jones. West testified that he drove the brown Chevy Malibu to a remote spot, at Gerrell's direction, while Gerrell followed with Hardy and Jones in the blue Plymouth Valiant. According to West, when the group arrived at the designated spot, Gerrell ordered Hardy and Jones into the brown Chevy Malibu and began questioning them about the location of the drugs that they had just bought; the men indicated that Robertson had them. West testified that, at this point, the victims began to struggle, and Gerrell fired point blank into each man's head, killing the men and spattering West's shirt and blue jeans with their blood. According to West, Gerrell then said that he planned to find Robertson and kill him, and Gerrell threatened to kill West if West did not help him. West testified that he and Gerrell then moved to the blue Plymouth Valiant, where the two men changed clothes and attempted to wipe off the victims' blood with a towel. West also testified that Gerrell placed some jewelry and

23

other items into the trunk of the blue Valiant, before the men drove off to find Robertson.

In sum, there was strong evidence on both sides of the case with regard to Robertson's specific intent to kill Hardy and Jones, and the issue of Robertson's guilt of first degree murder was sharply contested at trial. Under <u>Brecht</u>, it is not for this court to decide whether we think the jury's verdict was correct; instead, the question for the court is whether we have a "grave doubt" that the constitutionally erroneous instruction on the element of specific intent had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. at 637; <u>O'Neal v. McAninch</u>, 513 U.S. at 436.

In the light of all the evidence and the testimony, we must say that we have "grave doubt" about the harmlessness of the <u>Sandstrom</u> error in this case. <u>See</u> <u>O'Neal v. McAninch</u>, 513 U.S. at 436 (holding that, under <u>Brecht</u>, habeas relief should issue whenever the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error"). <u>See also</u> <u>Woods v. Johnson</u>, 75 F.3d 1017, 1026-27 (5th Cir. 1996) ("if our minds are 'in virtual equipoise as to the harmlessness' under the <u>Brecht</u> standard, of the error, then we must conclude that it was harmful") (quoting <u>O'Neal</u>, 513 U.S. at 435). On the one hand, the prosecution presented no evidence that proved that Robertson was the triggerman; nor was there any evidence that West or Gerrell acted to kill Hardy and Jones at Robertson's request, or with his

24

approval, or as part of some sort of common plan they had with him. On the other hand, the jury was offered substantial testimony from West and Washington and a statement from Robertson that <u>could</u> have allowed the jury to conclude that Robertson did not have any specific intent to kill Hardy or Jones. However, the erroneous jury instruction did not merely omit the requirement that the jury find specific intent to kill; it effectively told the jury that they could ignore Robertson's evidence as it related to this point and convict Robertson of first degree murder without actually finding that Robertson had a specific intent to kill Hardy and Jones. Based on our consideration of the record, we seriously doubt that the jury actually evaluated the evidence with the purpose of determining whether Robertson had a specific intent to kill Hardy and Jones. Accordingly, we are left with the conclusion that the state trial court's erroneous jury instruction did have a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. at 637.[11]

---

[11] The Respondent contends that, because Robertson claimed to have nothing to do with the murders, the jury was not required to assess Robertson's specific intent. However, the Respondent's contention is wrong as a matter of law. As <u>In re Winship</u> and its progeny make clear, the state must prove – and the jury must find – each element of the crime – including the element of specific intent to kill – beyond a reasonable doubt. In this case, we have grave doubt about whether the jury actually considered the evidence with the purpose of determining whether Robertson had a specific intent to kill Hardy and Jones. Certainly, the inference of specific intent was not "inescapable from the evidence produced concerning the nature of the criminal act," <u>Garland v. Maggio</u>, 717 F.2d 199, 204 (5th Cir. 1983), considering the exculpatory testimony of Consuela Washington and David West and the out-of-court statement made by Robertson that reasonably could have allowed the jury to find that

25

V

For the foregoing reasons, we conclude that the district court erred in denying Robertson's petition for federal habeas relief pursuant to 28 U.S.C. § 2254. Accordingly, we REVERSE the judgment of the district court and REMAND.

REVERSED AND REMANDED.

---

Robertson lacked the requisite specific intent to kill. Compare State v. West, 568 So. 2d at 1024-25 (finding the jury instruction not harmless beyond all reasonable doubt under Chapman, based in part on testimony by West that would have allowed a reasonable jury to find that West lacked specific intent to kill), with Gerrell v. Whitley, No. 92-4019(F)(6) (E.D. La. May, 3, 1993) (finding the same instruction harmless because it played no role in the ultimate outcome of Gerrell's case), aff'd, No. 93-3345 (5th Cir. Sept. 1, 1994) (per curiam) (affirming the denial of federal habeas for essentially the same reasons stated by the district court).